# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-252 (KMM/JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| | **and** |
| Eric Marcel Turner, a/k/a "Xavier Thomas," | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## I.      Introduction

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for a report and recommendation on Defendant Eric Marcel Turner's First Motion to Suppress (Dkt. No. 38), Second Motion to Suppress (Dkt. No. 42), and Motion to Suppress Evidence of Identification (Dkt. No. 52); and for an order on Mr. Turner's Motion to Disclose the Identity of All Informants (Dkt. No. 41) and Motion for Witnesses (Dkt. No. 53).

Mr. Turner is charged with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); and Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Indictment at 1–2, Dkt. No. 1.) Summarizing the investigation, the United States contends that Mr. Turner twice sold fentanyl to an informant. (Gov't Resp. at 1, Dkt. No. 44.) The United States further

contends that subsequent surveillance and investigation linked Mr. Turner to an apartment at 5xx Park Street in Saint Paul, Minnesota. (*Id.*) Search warrants executed at that apartment and on Mr. Turner's person yielded 310 grams of fentanyl, a loaded firearm, and a debit card in the name of "Xavier Thomas," a fictitious name that Mr. Turner allegedly used to rent the apartment. (*Id.*)

Mr. Turner filed several nondispositive and dispositive motions, and the Court held a motions hearing on June 21, 2024. Assistant United States Attorney Garrett Fields represented the United States. Mr. Turner represented himself, and Assistant Federal Defender Aaron Morrison appeared as standby counsel. After the hearing, Mr. Turner filed two supplemental briefs (Dkt. Nos. 62 and 66), which the Court had not authorized (*see* Mot. Hr'g Tr. at 40–41, Dkt. No. 63), but which the Court nonetheless reviewed. The Court took the motions under advisement on July 22, 2024, the date the motions hearing transcript was filed, and the date the Court had told the parties at the hearing would be the under-advisement date (*id*. at 44).

In Mr. Turner's First Motion to Suppress (Dkt. No. 38), he seeks to suppress evidence seized during a search of Apartment #6xx at 5xx Park Street in Saint Paul, Minnesota. The Court will refer to the search warrant authorizing this search as the "Apartment #6xx Warrant." As grounds for suppression, Mr. Turner argues that an earlier vehicle tracking order ("Tracking Order") and search warrant authorizing a dog sniff of the door of Apartment #6xx ("Dog Sniff Warrant") were improperly issued, as the applications for those search warrants did not demonstrate the existence of probable cause. (Def.'s First Mot. Suppress at 1, Dkt. No. 38.) Specifically, Mr. Turner challenges the reliability of a

confidential informant, the use of an unwitting party in two controlled buys, the nexus between his vehicle and criminal activity, and the nexus between Apartment #6xx and criminal activity. (Def.'s Mem. Supp. First Mot. Suppress at 11, 15, 31, Dkt. No. 39.) He also asks for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), concerning information allegedly omitted from affidavits supporting the warrant applications (*id.* at 91) and concerning inconsistent information set forth in the affidavit for the Dog Sniff Warrant and the affidavit for a later search warrant for Mr. Turner's DNA ("DNA Warrant") (*id.* at 93–94).

In his Second Motion to Suppress (Dkt. No. 42), Mr. Turner alleges a lack of probable cause, and also raises additional arguments to suppress evidence. He argues that the officers executing the Dog Sniff Warrant violated the Fourteenth Amendment by not activating their body cameras. (Def.'s Mem. Supp. Second Mot. Suppress at 8–9, Dkt. No. 43.) He contends that the supporting affidavit for the Apartment #6xx Warrant omitted information about the detection dog's certification in violation of *Franks v. Delaware*. (*Id.* at 34.) Finally, he argues that the involvement of an unwitting person in the two controlled buys was entrapment and that information in search warrant affidavits was stale. (*Id.* at 45–48.)

In Mr. Turner's Motion to Suppress Evidence of Identification (Dkt. No. 52), Mr. Turner moves to suppress an individual's identification of him from a photograph on the ground that the identification procedure was impermissibly suggestive. (Def.'s Mot. Suppress Identification at 7.) In the Motion to Disclose the Identity of All Informants (Dkt. No. 41), Mr. Turner asks the Court to order the United States to disclose the identities of

the confidential informant and the unwitting person who participated in the controlled buys. Lastly, in the Motion for Witnesses (Dkt. No. 53), Mr. Turner notifies the Court of his intent to call investigator Todd Turpitt, apartment building manager Ash Anderson, Detective Anthony Patsy, Detective Jeremiah Jessen, and DEA Agent Ryan Westby as witnesses.

## II.    Report and Recommendation on Mr. Turner's Dispositive Motions

### A.    Facts

There was no witness testimony at the motions hearing. The facts in this section are taken solely from the parties' hearing exhibits.

### 1.    The Tracking Order (Gov't Ex. 1)

On March 24, 2023, the Honorable Kelly Olmstead, Ramsey County District Judge, issued the Tracking Order, which authorized the installation of a mobile tracking device on a white Jeep Cherokee with Minnesota license plate HXLxxx. (Gov't Ex. 1.) Hennepin County Sheriff's Office Detective Jeremiah Jessen was the applicant for the Tracking Order. (*Id.* at 1.)

The facts set forth in this section are taken from Detective Jessen's application. The detective was investigating an "unknown Black male" for selling narcotics, specifically, fentanyl. (*Id.* at 2.) Within the two weeks preceding the search warrant application, a confidential reliable informant ("CRI") had provided information about a Black male who sold fentanyl and drove a white Jeep Cherokee, MN plate HXLxxx. (*Id.*) The CRI had purchased fentanyl from the individual in the past through an unwitting person. (*Id.*) The CRI said the fentanyl dealer lived in Saint Paul. (*Id.*)

4

The CRI had provided information previously to Detective Jessen, which had been corroborated as true and accurate, and which had led to the controlled purchase of narcotics. (*Id.*) In addition, information from the CRI had been the foundation of other search warrants that had led to the seizure of narcotics and other contraband and to the arrests of numerous individuals. (*Id.*) Detective Jessen deemed the CRI reliable. (*Id.*)

Within the 72 hours preceding the application for the Tracking Order, the CRI arranged to purchase fentanyl from the target dealer. (*Id.* at 3.) Investigators' search of the CRI and the CRI's vehicle yielded no contraband. (*Id.*) Detective Jessen provided buy-fund money to the CRI, who then went to pick up the unwitting person. (*Id.*) Investigators surveilling the CRI saw the unwitting person get into the CRI's car. (*Id.*) The unwitting person told the CRI where to meet the target dealer, and investigators followed. (*Id.*) Detective Jessen and other officers saw a white Jeep Cherokee, MN plate HXLxxx, at the buy location. (*Id.*) The Cherokee was driven by a Black male and parked next to the CRI's car. (*Id.*) Officers watched as the unwitting person got out of the CRI's car, got into the front seat of the Cherokee, then got out of the Cherokee and back into the CRI's car. (*Id.*) The Cherokee drove away, followed by some of the officers, while other officers followed the CRI's car as the CRI dropped off the unwitting party and then drove to a predetermined location to meet with investigators. (*Id.*) There, the CRI provided Detective Jessen with a powdery substance which later tested positive for fentanyl. (*Id.*) The CRI told Detective Jessen that the unwitting party had purchased the fentanyl from the driver of the Cherokee with the buy-fund money. (*Id.*) The officers surveilling the Cherokee saw it travel back to the area of the controlled buy and stop near a female standing on the side of the road. (*Id.*)

The female entered the Cherokee for a short time, then got out and walked away. (*Id.*) Investigators believed this encounter was a narcotics transaction. (*Id.*)

## 2.     The Rent Roll Roster Warrant (Gov't Ex. 2)

On April 7, 2023, Detective Jessen applied for a search warrant for a rent roll roster showing the names, addresses, phone numbers, and vehicles registered to renters at an apartment complex located at 5xx Park Street in Saint Paul, Minnesota. (Gov't Ex. 2.) The facts set forth in this section are taken from Detective Jessen's application.

Detective Jessen wrote that he was investigating Mr. Turner for narcotics. (*Id.* at 2.) Detective Jessen repeated all the information he had included in the application for the Tracking Order. (*Id.* at 2–3.) In addition, Detective Jessen averred that after the controlled buy, he had learned that the registered owner of the Cherokee was Mr. Turner and that Mr. Turner had previous arrests for DWI in Minnesota, possession with intent to manufacture or deliver a controlled substance in North Dakota, possession of heroin with intent to deliver in North Dakota, selling opium or a derivative in North Dakota, "weapons felony firearm" in Michigan, and receiving stolen property in Michigan. (*Id.* at 3–4.) Detective Jessen had obtained a photograph of Mr. Turner from a law enforcement database and confirmed through visual surveillance that Mr. Turner was the person Detective Jessen had seen driving the Cherokee during the controlled buy and on multiple other occasions. (*Id.* at 4.) Detective Jessen also saw Mr. Turner going in and out of the front door of 1xx Genesee Street in Saint Paul and on multiple occasions observed Mr. Turner leave 1xx Genesee Street and drive to 5xx Park Street in the Cherokee. (*Id.* at 5.) Investigators also saw Mr. Turner drive into and out of the secure parking garage at 5xx Park Street.

6

Meanwhile, the CRI gave Detective Jessen two phone numbers that Mr. Turner used. (*Id.* at 4.) The detective learned from another task force officer that one of the numbers had been identified during a narcotics investigation in North Dakota. (*Id.*)

In the 72 hours before applying for the Rent Roll Roster Warrant, investigators arranged for the CRI to make another controlled buy of fentanyl from Mr. Turner. (*Id.*) The details of the transaction were the same as the first. (*Id.*) Investigators surveilled the CRI's movements, the meet location, Mr. Turner's residence at 1xx Genesee Street in Saint Paul, and 5xx Park Street. (*Id.*) They saw Mr. Turner leave 1xx Genesee Street through the front door and drive away in the Cherokee. (*Id.*) Through electronic surveillance, Detective Jessen knew that Mr. Turner drove directly to 5xx Park Street and entered a secure parking garage for the apartment building. (*Id.*) A garage door opener is required to enter and exit the parking garage, and the garage is attached to the apartment building. (*Id.*) According to building management, openers for the garage at 5xx Park Street are given only to building tenants and specific garage door openers are assigned to the tenants of specific apartments. Detective Jessen had also seen Mr. Turner enter 5xx Park Street through the building's front door, something he knew could not be done without an access code. (*Id.* at 5.) Visual surveillance officers saw Mr. Turner leave the garage and drive to the predetermined buy location. (*Id.*) As before, the unwitting party entered and exited the Cherokee; the CRI drove away and dropped off the unwitting person; the CRI met with Detective Jessen and provided suspected fentanyl; and the CRI told the detective that the unwitting person had purchased fentanyl using the buy-fund money provided by law enforcement. (*Id.* at 5.)

Detective Jessen knew from training and experience that narcotics traffickers frequently use "stash houses." (*Id.*)

Ramsey County District Judge Timothy Carey issued the Rent Roll Roster Warrant on April 7, 2023. (*Id.* at 8.) Lease information was provided by apartment management on April 10, 2023. (*Id.* at 9.)

### 3.   The Dog Sniff Warrant (Gov't Ex. 3)

On April 12, 2023, Detective Jessen applied for a search warrant for an exterior doorknob swab and/or dog sniff of the door of Apartment #6xx. (Gov't Ex. 3.) The facts set forth in this section are taken from Detective Jessen's application.

Detective Jessen repeated all the information previously set forth in the Tracking Order application and the Rent Roll Roster Warrant application. (*Id.* at 1–5.) In addition, Detective Jessen averred that within the past 24 hours, Detective Anthony Patsy had spoken with management of 5xx Park Street, and learned of a video surveillance system that covered the parking garage and apartment building. (*Id.* at 5.) Detective Patsy and management reviewed the video footage and saw the Cherokee driven by Mr. Turner enter the parking garage. They also saw an unknown Black male enter the elevator on the sixth floor of the apartment building, take the elevator to the garage, walk to the Cherokee, and meet briefly with Mr. Turner. (*Id.*) The Cherokee then drove out of the garage, and the unknown man walked back into the apartment building. (*Id.*) The apartment manager identified the unknown man as "Xavier Thomas," said that Xavier Thomas rented Apartment #6xx, and confirmed that the garage door opener used by Mr. Turner was associated with Apartment #6xx. (*Id.*) Mr. Turner drove directly from 5xx Park Street to

the controlled buy location. (*Id.*) Investigators saw the Cherokee drive to 5xx Park Street numerous times in the two weeks before the application date. (*Id.* at 6.) As of April 12, 2023, the date of Detective Jessen's application for the Dog Sniff Warrant, the tracker on the Cherokee showed it at 5xx Park Street 37 times in the preceding 16 days. (*Id.* at 6.) The earliest the Cherokee had been at 5xx Park Street was 7:00 a.m. and the latest the Cherokee had been at 5xx Park Street was 1:30 a.m. (*Id.* at 6.) The Cherokee was typically at 5xx Park Street for no more than six to 20 minutes. (*Id.* at 6.)

Ramsey County Judge Reynaldo Aligada, Jr. issued the Dog Sniff Warrant on April 12, 2023. (*Id.* at 9.) A dog sniff was conducted on the door of Apartment #6xx two days later, on April 14, 2023. (*Id.* at 10.)

### 4. The Apartment #6xx Warrant (Gov't Ex. 4)

On April 17, 2023, Detective Jessen applied for a search warrant for Apartment #6xx in the 5xx Park Street apartment building. (Gov't Ex. 4.) Detective Jessen repeated all the information previously set forth in the applications for the Tracking Order, Rent Roll Roster, and Dog Sniff Warrant. (*Id.* at 2–6.) The electronic surveillance showing that the Cherokee had been at 5xx Park Street was updated to aver that the Cherokee had been at 5xx Park Street 40 times in the preceding 21 days. The visits were between six and 20 minutes in length, and occurred as early as 7:00 a.m. and as late as 1:30 a.m.

In addition, Detective Jessen averred that within the past 72 hours, Officer Heather Jensen's police dog, Kya, had conducted a sniff of the lower door seam of Apartment #6xx. (*Id.* at 6.) Officer Jensen told Detective Jessen that Kya alerted to the presence of narcotics.

(*Id.*) Detective Jessen wrote, "Kya is certified through the National Police Canine Association in the detection of narcotics." (*Id.*)

Detective Jessen also asked a crime analyst at a local police department to investigate Xavier Thomas and provided the analyst with Xavier Thomas's purported birthdate and a copy of a paper driver's license supplied by 5xx Park Street management. (*Id.*) The crime analyst determined that no person with that name and birthdate existed, and the driver's license number also did not exist. (*Id.*) In Detective Jessen's training and experience, narcotics traffickers go to great lengths to conceal their identities. (*Id.*)

Ramsey County Judge Teresa Warner issued the Apartment #6xx Warrant on April 17, 2023. (*Id.* at 10.) Fentanyl, two bags of white powder, three baggies of suspected narcotics, packaging materials, and a loaded handgun were seized during the subsequent search on April 19, 2023. (*Id.* at 11.)

### 5.    The DNA Warrant (Gov't Ex. 5)

On March 20, 2024, DEA Task Force Agent and Hennepin County Sheriff's Office Detective Ryan Westby applied for a search warrant for a DNA sample from Mr. Turner. (Gov't Ex. 5.) Agent Westby summarized the investigation, including the two controlled buys, and Mr. Turner's travel to and from 5xx Park Street and 1xx Genesee Street. (*Id.* at 2–4.) Agent Westby also stated that the 5xx Park Street building manager had identified the person driving the Cherokee as Xavier Thomas and said that Xavier Thomas rented Apartment #6xx. (*Id.*)

Agent Westby's account of what building management said differed from information in Detective Jessen's applications for the Dog Sniff Warrant and the

Apartment #6xx Warrant. In Detective Jessen's applications he stated that building management had identified a different man (the unknown man seen going down in the elevator from the sixth floor to the garage, talking to the driver of the Cherokee, then returning to the elevator) as Xavier Thomas. Detective Jessen did not say, but Agent Westby did, that building management identified the driver of the Cherokee as Xavier Thomas. According to Agent Westby, investigators later sent the building manager a photograph of Mr. Turner, and the manager identified the person in the photo as Xavier Thomas. (*Id.*)

After Apartment #6xx was searched, officers apprehended Mr. Turner and searched him and the Cherokee. (*Id.* at 5.) They recovered a key fob and garage door opener for 5xx Park Street and a debit card in the name of Xavier Thomas. (*Id.*) DNA samples collected from within Apartment #6xx and analyzed by the Minnesota Bureau of Criminal Apprehension laboratory yielded statistical profiling data. (*Id.*) If DNA samples from Mr. Turner could be obtained, Agent Westby averred, investigators could compare those samples to the DNA obtained from Apartment #6xx. (*Id.* at 5–6.) Mr. Turner was in custody at the Sherburne County Jail at that time. (*Id.* at 7.) U.S. Magistrate Judge Elizabeth Cowan Wright issued the DNA Warrant on March 20, 2024. (*Id.* at 6.)

## B.    Generally Applicable Legal Standards

"Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016); *see* Fed. R. Crim. P. 41. "[P]robable cause is a fluid concept—turning on

the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Id.* at 236.

When the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). "The affidavit should be examined under a common sense approach and not in a hypertechnical fashion." *Id.* (cleaned up); *accord United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) ("Affidavits must be read in 'a common-sense and realistic fashion . . . .'"). Therefore, "[w]hen reviewing the issuance of a warrant, [this Court] afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge 'had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019).

A warrant is supported by probable cause if, "given all the circumstances set forth in the affidavit, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that contraband or evidence of a crime will be found in the place to be searched. *United States v. Edmiston*, 46 F.3d 786, 789 (8th Cir. 1995) (cleaned up). "To establish probable cause, an officer may rely on an informant's tip." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006). "When an informant has provided reliable information in the past *or* where his tip was independently corroborated,

a court may deem the informant's tip sufficiently reliable to support a probable cause determination." *Id.* (emphasis added). Under the reliable-information-in-the-past option, "[t]he reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998). Under the independent-corroboration option, "[i]t is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Solomon*, 432 F.3d at 828 (cleaned up)

### C.   Discussion

#### 1.   The CRI's Reliability Was Established, and Information from the CRI Provided Probable Cause for the Tracking Order.

Mr. Turner argues that information provided by the CRI was not sufficiently corroborated to provide probable cause for the Tracking Order. (Def.'s Mem. Supp. First Mot. Suppress at 11, Dkt. No. 39.) In other words, Mr. Turner argues, the CRI was not reliable. (*Id.*)

The Court disagrees and finds that the Tracking Order application established the CRI's reliability. First, Detective Jessen averred that the informant had previously provided information about individuals who sold narcotics in the Twin Cities area, which the detective had corroborated and found accurate. The CRI's history of providing truthful information to law enforcement established the CRI's reliability. *See Wright*, 145 F.3d at 975. Second, information previously provided by the CRI had led to the seizure of narcotics as a result of executed search warrants and to the arrests of individuals. This also established the CRI's record of providing reliable information. *See Petruk*, 929 F.3d at 959.

13

Third, Detective Jessen had independently corroborated information provided by the CRI: that the Black male known to the CRI sold fentanyl, that the fentanyl dealer drove a vehicle whose make, model, and color the CRI knew (a white Jeep Cherokee), that the CRI knew the license plate number of the white Jeep Cherokee (Minnesota HXLxxx), and that the fentanyl transactions involved the use of an unwitting party. Law enforcement's independent corroboration of these details established the CRI's reliability. *See Solomon*, 432 F.3d at 828.

###   2.     The Use of an Unwitting Party Did Not Detract from Probable Cause or Constitute Entrapment.

Mr. Turner argues that the use of an unwitting party broke the link between the Cherokee and the fentanyl, so the CRI's information could not establish that drugs were sold from the Cherokee. (Def.'s Mem. Supp. First Mot. Suppress at 14, Dkt. No. 39.) In addition, Mr. Turner points out, the unwitting person was not known to be reliable. (*Id.* at 18.)

The use of an unwitting person can support probable cause for a search. *United States v. Roberts*, No. 1:19-CR-72-SNLJ-ACL, 2019 WL 4648456, at *4 (E.D. Mo. Sept. 5, 2019), *R. & R. adopted*, 2019 WL 4645370 (E.D. Mo. Sept. 24, 2019) (citing *United States v. Artez*, 389 F.3d 1106 (10th Cir. 2004); *United States v. Washington*, 775 F.3d 405 (D.C. Cir. 2014); *United States v. Jordan*, 999 F.2d 11 (1st Cir. 1993); *United States v. Blackwood*, 913 F.2d 139, 141 (4th Cir. 1990); *United States v. Washington*, 380 F.3d 236 (6th Cir. 2004)). The Court considers the totality of the circumstances to determine if that is so. *See id.* at *5.

14

Here, the reliability of the informant had already been established before the controlled buy, given the informant's history of providing truthful information to law enforcement, and because information previously provided by the informant had led to the seizure of narcotics and the arrests of individuals. The use of an unwitting person to conduct the actual, face-to-face narcotics transaction did not diminish the informant's reliability, particularly where the CRI told law enforcement before the first controlled buy that the fentanyl dealer used an unwitting person as a cut-out during drug transactions. The use of an unwitting person during the controlled buy was consistent with that information. While it is possible that the unwitting person might have had the fentanyl before entering the Cherokee (unlike the CRI, the unwitting person could not be searched by law enforcement before the controlled buy), the events and activities observed by surveillance officers indicated that the unwitting person most likely obtained the fentanyl from the person in the Cherokee. This was consistent with the CRI's statement to Detective Jessen that the unwitting party had purchased the fentanyl from the driver of the Cherokee. Accordingly, the Court finds that the use of the unwitting party did not detract from probable cause.

Mr. Turner also argues that the use of the unwitting person was entrapment. "Entrapment is an affirmative defense that is a question of fact generally decided by a jury." *United States v. White*, No. CR 22-207 (JRT/ECW), 2023 WL 5558838, at *4 (D. Minn. Aug. 29, 2023) (citing *United States v. Young*, 613 F.3d 735, 746 (8th Cir. 2010)), *reconsideration denied*, No. CR 22-207 (JRT/ECW), 2024 WL 1976704 (D. Minn. May 3, 2024). "Entrapment is an affirmative defense that requires a defendant to present evidence that a government agent implanted in an innocent person's mind the disposition to commit

a criminal act." *United States v. Havlik*, 710 F.3d 818, 823 (8th Cir. 2013) (cleaned up). Inducement to commit a crime may include "pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." *United States v. Stanton*, 973 F.2d 608, 610 (8th Cir. 1992) (cleaned up). "It consists of more than just providing an opportunity to break the law." *United States v. Clarett*, 907 F.3d 1100, 1103 (8th Cir. 2018). "[I]t is well settled that the government may use artifice, stratagem, and undercover agents in its pursuit of criminals." *United States v. Myers*, 575 F.3d 801, 806 (8th Cir. 2009).

On the record before the Court, Mr. Turner has not shown that a government agent implanted in his mind, through the involvement of the unwitting participant, a disposition to commit a criminal act. The Court does not recommend that any evidence be suppressed due to entrapment.

### 3. The Application for the Tracking Order Established a Nexus Between the White Jeep Cherokee and Drug Trafficking.

Mr. Turner next argues that the application for the Tracking Order did not establish a nexus between the white Jeep Cherokee and drug trafficking. (Def.'s Mem. Supp. First Mot. Suppress at 27, Dkt. No. 39.) "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). Here, the CRI, whose reliability was established, told law enforcement that a Black male was using a white Jeep Cherokee, bearing Minnesota license plate HXLxxx, in furtherance of narcotics sales. Detective

16

Jessen and other surveilling officers saw that Cherokee arrive at the controlled buy location, the Cherokee park next to the CRI's vehicle, and the unwitting party enter and exit the Cherokee. After the CRI gave the fentanyl to Detective Jessen, the CRI said the unwitting party had purchased it from the driver of the Cherokee. Other officers, still watching the Cherokee, saw it stop near a female standing on the side of the road and the driver engage in another suspected narcotics transaction. The Court concludes that these facts in the application established a nexus between the Cherokee and narcotics transactions.

### 4.     The Information in the Tracking Order Application Was Not Stale.

Mr. Turner argues that information in the tracking order application was stale because Detective Jessen did not include the dates when the CRI previously bought fentanyl from Mr. Turner or "when Detective Jessen completed any of his investigation." (Def.'s Mem. Supp. Second Mot. Suppress at 45, 48, Dkt. No. 43.)

"[T]here is no formula for determining when information has become stale." *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999). "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). "Where continuing criminal activity is suspected, the passage of time is less significant." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (finding that a two-and-a half-week lapse after a controlled buy did not render information stale); *see United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008) (finding that two weeks between a controlled buy and the warrant application did not render

information stale because of the ongoing nature of drug trafficking). Information obtained within 72 hours of a warrant application "can hardly be deemed stale information." *See United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012).

Detective Jessen's investigation of the suspected fentanyl dealer was ongoing, not completed, when he applied for the Tracking Order. The detective included in the application information he had received from the CRI within the previous two weeks and details of the controlled buy that had been conducted within the previous 72 hours. This information was not stale. *See Jeanetta*, 533 F.3d at 655; *Carnahan*, 684 F.3d at 736. With respect to the unknown date that the CRI had purchased fentanyl from the seller "in the past" (Gov't Ex. 1 at 2), that information was background information, which Detective Jessen provided to explain what led up to the controlled buy. The CRI's past purchases were not essential to the determination of probable cause. Furthermore, the controlled buy conducted in the 72 hours before the Tracking Order application refreshed the information provided by the CRI about past purchases. *See United States v. Reed*, No. CR 17-253 (MJD/BRT), 2018 WL 4233836, at *6 (D. Minn. July 11, 2018), *R. & R. adopted*, 2018 WL 4232999 (D. Minn. Sept. 5, 2018) (citing *Carnahan*, 684 F.3d at 736; *United States v. Macklin*, 902 F.2d 1320, 1326 (8th Cir. 1990)).

### 5.    The Dog Sniff Warrant Was Supported by Probable Cause.

Mr. Turner argues that "no evidence" links "criminal activities to" Apartment #6xx. (Def.'s Mem. Supp. First Mot. Suppress at 31, Dkt. No. 39.) He points out that neither he nor the "unknown Black male" was seen entering or exiting the apartment. (*Id.* at 32.) That is true, but other facts averred in the Dog Sniff Warrant application created a nexus between

the apartment and criminal activity and provided probable cause for the warrant. In particular, Detective Jessen described the two controlled buys involving Mr. Turner and the Cherokee, Mr. Turner's travels in the Cherokee between his residence at 1xx Genesee Street and 5xx Park Street, and Detective Patsy's conversation with building management. The supporting affidavit also relayed that Detective Patsy and building management had reviewed video surveillance system footage, saw Mr. Turner's Cherokee enter the secure parking garage, and saw an unknown Black male take an elevator from the 6th floor to the garage, walk to the Cherokee, and meet briefly with Mr. Turner. Building management identified the unknown man as Xavier Thomas and said that Xavier Thomas rented Apartment #6xx. Building management also confirmed that the garage door opener used by Mr. Turner belonged to Xavier Thomas and was associated with Apartment #6xx. These facts are sufficient to establish probable cause to believe that Apartment #6xx contained evidence of criminal activity.

### 6.    Due Process Does Not Demand the Suppression of Any Evidence.

Mr. Turner contends that the officers who executed the Dog Sniff Warrant violated due process by not activating their body cameras. He relies on *Arizona v. Youngblood*, 488 U.S. 51 (1988), to support his position that officers have a constitutional obligation to activate body cameras. But *Youngblood* was about law enforcement's failure to preserve potentially exculpatory evidence; it did not impose an affirmative, due process-based duty to record potentially exculpatory evidence in the first place. *See id.* at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, *failure*

*to preserve* potentially useful evidence does not constitute a denial of due process of law.")
(emphasis added).

Mr. Turner's reliance on *United States v. Aguirre-Cuenca*, No. 21-4307, 2023 WL
245710, at *3 (4th Cir. Jan. 18, 2023), is also unavailing. There, the court "assume[] . . .
without deciding that *Youngblood* also applies to the failure to create exculpatory evidence
through failure to activate a body camera." *Id.* (emphasis omitted). Even though the officer
in *Aguirre-Cuenca* had not complied with a departmental policy requiring him to activate
his body camera, there were no facts evidencing bad faith, and thus no due process
violation. *Id.* Similarly, here, Mr. Turner has not identified facts establishing bad faith by
Officer Jensen or the other officers executing the Dog Sniff Warrant. He asserts generally
that police officers "may have personal incentives for successful arrests" and without
attribution that "the success of a dog handler is measured by the hit rate of their drug dog."
(Def.'s Mem. Supp. Second Mot. Suppress at 16.) Not only is there no evidentiary support
for these assertions, but even if they are true, they are not evidence of bad faith by Officer
Jensen or the other officers. An officer's "failure to activate body-worn cameras alone does
not constitute a due process violation." *United States v. Tillard*, No. 18-CR-6091-FPG,
2020 WL 57198, at *5 (W.D.N.Y. Jan. 6, 2020); *see also United States v. Taylor*, 312 F.
Supp. 3d 170, 178 (D.D.C. 2018) (finding no bad faith even though officer failed to follow
departmental policy); *United States v. Brown*, No. 2:17-CR-58-JCM-VCF, 2017 WL
8941247, at *15–16 (D. Nev. Aug. 14, 2017) (finding officers acted, at most, negligently
in failing to activate their body cameras), *R. & R. adopted*, 2018 WL 451556 (D. Nev. Jan.
16, 2018).

20

### 7.    Mr. Turner Is Not Entitled to a *Franks* Hearing.

An affidavit supporting a search warrant is presumed to be truthful. *Franks v. Delaware*, 438 U.S. 154, 164 (1978). A defendant may seek a *Franks* hearing "to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *See United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). Before a court will convene a *Franks* hearing, however, the defendant must make a substantial preliminary showing that (1) the affidavit contained a false statement made either knowingly and intentionally, or with reckless disregard for the truth; and (2) with the false statement corrected or the missing information inserted, the affidavit no longer establishes probable cause for the search. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). Recklessness may be inferred from omissions in an affidavit when the material omitted "would have been clearly critical to a finding of probable cause." *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015) (quoting *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011)).

"The requirement of a substantial preliminary showing is not lightly met." *Arnold*, 725 F.3d at 898 (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 2009)). Only material false statements or omissions will trigger a *Franks* hearing. *Franks*, 438 U.S. at 169. Materiality is tested by rewriting the application to correct the false statements or provide the missing information, and if the rewritten application still shows probable cause, then no hearing is required. *Id.* at 171–72.

21

### a.   Kya's Positive Alert

Kya, the police dog who alerted at the door seam of Apartment #6xx, was certified to detect cocaine, heroin, methamphetamine, and MDMA. (Gov't Ex. 10.) Kya was not certified to detect fentanyl. (*See id.*) Mr. Turner asserts that no narcotics other than fentanyl were seized from Apartment #6xx and, therefore, either Kya did not actually alert or Officer Jensen "cued" Kya to alert. (Def.'s Mem. Supp. Second Mot. Suppress at 29, Dkt. No. 43.) Mr. Turner argues that Detective Jessen should have included these facts in the Apartment #6xx Warrant application. (*Id.* at 35.)

The Court proceeds directly to the second *Franks* step: rewriting the application to excise the information about Kya's positive alert. When that is excised, what is left includes descriptions of the two controlled buys from a Black male in a white Jeep Cherokee registered to Mr. Turner, Mr. Turner's 40 trips to 5xx Park Street in 21 days, Detective Patsy's review of the surveillance system footage with building management, management's identification of the unknown man who met with Mr. Turner in the secure parking garage as Xavier Thomas, management's statement that Xavier Thomas rented Apartment #6xx, and management's confirmation that Mr. Turner used the garage door opener assigned to Apartment #6xx to enter and exit the apartment complex's secure parking garage. This information was sufficient, even without Kya's positive alert, to establish probable cause that evidence of drug trafficking would be found in Apartment #6xx and, therefore, to allow the state court's issuance of the Apartment #6xx Warrant. Accordingly, no *Franks* hearing is required on the subject of Kya's positive alert.

### b.     The Conversation Between Detective Patsy and Building Management

Mr. Turner argues that the conversation between Detective Patsy and building management, as described in the Apartment #6xx Warrant application, either never occurred or was summarized inaccurately. As his offer of proof, Mr. Turner contends that Agent Westby did not describe the conversation in the later DNA Warrant application because he must not have believed it, that the video footage Detective Patsy and building management supposedly viewed has been destroyed, and that Detective Patsy did not mention in his contemporaneous police report that he had viewed security footage with building management. (Mot. Hr'g Tr. at 19, 34; Def.'s Reply Mem. at 28.)

Mr. Turner's argument that Agent Westby did not describe the conversation in the DNA Warrant application because he must not have believed Detective Patsy is pure speculation and does not support the request for a *Franks* hearing. Significantly, Mr. Turner has not provided the Court with the police report, handicapping the Court's efforts to ascertain whether this omission exists; if it does, determine what its scale is; or evaluate it in context. Finally, the video footage was destroyed according to the apartment complex's retention policy, which is to retain surveillance video for only 30 days. (Gov't Ex. 8.) Mr. Turner has not asserted that law enforcement destroyed the video, or that any destruction was done with the intent of putting potentially exculpatory evidence out of reach.

Mr. Turner's offer of proof does not warrant a *Franks* hearing.

> **c.      While the Court Is Concerned about Inconsistent Information in the Supporting Affidavits for the Dog Sniff Warrant and the DNA Warrant, Probable Cause Exists Without Any of this Information and Therefore the Inconsistency Does Not Require a *Franks* Hearing**

According to Detective Jessen's application for the Dog Sniff Warrant, building management identified the person who met with Mr. Turner in the garage as Xavier Thomas. That person, therefore, could not have been Mr. Turner, because Mr. Turner was driving the Cherokee. But in Agent Westby's application for the DNA Warrant, he stated that building management had identified the person driving the Cherokee (*i.e.*, Mr. Turner) as Xavier Thomas. Mr. Turner argues that he could not have been both the driver of the Cherokee parked in the garage and the person who rode down the elevator to the garage and met with the driver of the Cherokee, and he is right.

It is concerning that Detective Jessen and Agent Westby say different things about whom building management identified as "Xavier Thomas." According to Detective Jessen's affidavits, building management told Detective Patsy that Xavier Thomas was the unknown Black man who took the elevator down to the garage, spoke briefly with the driver of the Cherokee, then, as the Cherokee was leaving, turned and went back to the elevators. According to Agent Westby's affidavit, building management told Detective Patsy that Xavier Thomas was the driver of the Cherokee. As Mr. Turner emphatically argues, and the Court agrees, both statements cannot be true.

The Court cannot find, however, based on the record before it, that either Detective Jessen or Agent Westby deliberately made a false statement in their respective search warrant applications. The Court has considered, though, whether two diametrically

opposed, irreconcilable statements in different search warrant applications prepared by different law enforcement officers is circumstantial evidence of reckless disregard for the truth on the part of one or both officers.

The Court concludes the question need not be answered, because when the Court omits the paragraphs relating to the identifications of "Xavier Thomas" from the warrant applications, then rereads those warrant applications, the Court still finds probable cause to search Apartment #6xx for evidence of fentanyl trafficking. Omitting all information about whom building management identified as Xavier Thomas, one is still left with the following:

- Two controlled buys of substances that tested positive for fentanyl. The buys were conducted by a Black male in a white Jeep Cherokee that registers to Mr. Turner;

- Following the first controlled buy, the driver of the Cherokee stopped by an unknown female, who got into the Cherokee briefly, then left, behavior that experienced law enforcement officers consider indicative of a narcotics sale;

- In the second controlled buy, someone driving the Cherokee used the garage door opener assigned to Apartment #6xx and drove into the garage for 5xx Park Street. An unknown Black male then went to the elevator on the sixth floor of 5xx Park Street, took that elevator to the garage, met briefly with the driver of the Cherokee, then left as the Cherokee drove away;

- Mr. Turner made approximately 40 trips from his apartment on Genesee Street to the apartment building on Park Street in the space of only 21 days; and

- Mr. Turner has a criminal record of narcotics violations.

The Court also finds that it may legitimately consider building management's viewing of a photograph of Mr. Turner and identifying the person in the photograph as "Xavier Thomas." On April 19, 2023, Detective Jessen texted a photograph of Mr. Turner to building management and asked, "Do you know this guy?" (Def.'s Mot. Suppress Identification at 7, Dkt. No. 52; Def.'s Post-Hr'g Mem. at 3, Dkt. No. 62; Gov't Ex. 6.) Building management replied, "[I] believe it looks like Xavier from apt 6[xx] without his glasses." (Gov't Ex. 6.) This identification does not suffer from the ambiguity of whether Xavier Thomas was in the Cherokee or in the elevator. The Court finds this photographic identification means that—whether Xavier Thomas was in the Cherokee or in the elevator—he was one and the same man as Mr. Turner.

Because the information about exactly whom building management identified to Detective Patsy as Xavier Thomas on or about April 11, 2023 can be omitted from the search warrant applications without the loss of probable cause, this information is not material and this contradiction therefore cannot form the basis of a *Franks* hearing.

In addition, the Court notes that Detective Jessen's averment in the Dog Sniff Warrant application that building management had identified someone other than the Cherokee's driver as Xavier Thomas did not strengthen Detective Jessen's probable-cause showing; it weakened it. It would have been more helpful to Detective Jessen if building

26

management had identified the driver as Xavier Thomas. Thus, it would not be logical to conclude that Detective Jessen knowingly and intentionally, or with reckless disregard for the truth, made a false statement about whom it was that building management had identified as Xavier Thomas.

Mr. Turner's application for a *Franks* hearing is denied.

### 8.      The Photo Identification Procedure Was Not Impermissibly Suggestive.

Mr. Turner argues that the procedure used for building management to identify the unknown man on the apartment video surveillance system footage was impermissibly suggestive. (Def.'s Mot. Suppress Identification at 1, Dkt. No. 52.) He points out that building management did not identify the driver of the Cherokee, nor did building management identify the driver as Xavier Thomas. (*Id.*) Rather, building management identified the unknown man who took the elevator to the parking garage as Xavier Thomas (according to Detective Jessen's affidavits). Building management later identified a photograph of Mr. Turner as Xavier Thomas, but apparently without clarifying whether Xavier Thomas drove the Cherokee or rode the elevator.

The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). A tainted identification is not subject to automatic exclusion, however. *Id.* Instead, the Court "must screen the evidence for reliability pretrial." *Id.* "If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial." *Id.*

(cleaned up). "But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.*

Mr. Turner has not shown that the circumstances surrounding building management's identification of the unknown man on the apartment surveillance system video were suggestive at all, much less that there was a very substantial likelihood of misidentification, imposing an obligation on the Court to evaluate whether other indicia of reliability overcome police-arranged suggestibility. According to Detective Jessen's Apartment #6xx Warrant affidavit, Detective Patsy and building management watched the video footage together, and building management positively identified the unknown man as Xavier Thomas. These circumstances were not suggestive. Furthermore, the identification was reliable. Building management was familiar with Xavier Thomas, identified him from the video footage, and knew he rented Apartment #6xx. The Court addresses below the significance of this identification being followed within a few days by building management's identification of Mr. Turner as Xavier Thomas.

Mr. Turner finds it suspicious that on April 19, 2023, the same day as the search of Apartment #6xx, Detective Jessen texted a photograph of Mr. Turner to building management and asked, "Do you know this guy?" Building management replied, "[I] believe it looks like Xavier from apt 6[xx] without his glasses." (Gov't Ex. 6.) Mr. Turner questions the timing and purpose of this identification (Def.'s Mot. Suppress Identification at 8), but he has not shown that the circumstances of the identification were suggestive.

Having found that the circumstances of both identifications were not suggestive, the Court does not recommend suppressing them. To the extent Mr. Turner has questions about the identification procedures and purposes, he may certainly ask those at trial. He may also inquire about the discrepancy between building management's identification of another individual as Xavier Thomas on or about April 11, 2023, and the identification of Mr. Turner as Xavier Thomas a few days later.

> **D.      Recommendation**

The Tracking Order, Rent Roll Roster Warrant, Dog Sniff Warrant, Apartment #6xx Warrant, and DNA warrant were supported by probable cause, and no evidence seized pursuant to those warrants should be excluded. In addition, Mr. Turner is not entitled to a *Franks* hearing, and building management's identifications of Mr. Turner should not be suppressed. Accordingly, the Court recommends that all of Mr. Turner's dispositive motions be denied.

## III.    Order on Mr. Turner's Nondispositive Motions

The Court first addresses Mr. Turner's Motion for Witnesses (Dkt. No. 53). Although the document was filed as a motion, the filing states it is a notification of intent to call as witnesses investigator Todd Turpitt, apartment building manager Ash Anderson, Detective Anthony Patsy, Detective Jeremiah Jessen, and DEA Agent Ryan Westby. Insofar as the notification was intended for trial witnesses, the Court will deny the motion without prejudice because it is premature. Mr. Turner will have an opportunity to file a witness list closer to trial, on a schedule set by the district judge. To the extent the motion

was intended for a *Franks* hearing, the motion is denied as moot because there will be no *Franks* hearing, Mr. Turner having not made the requisite preliminary showing.

The Court now turns to Mr. Turner's Motion to Disclose the Identity of All Informants (Dkt. No. 41). Mr. Turner asks the Court to order the United States to disclose the identities of the CRI and the unwitting party.

The government has a limited privilege to withhold the identity of its confidential informants. *McCray v. Illinois*, 386 U.S. 300, 311 (1967). The defendant bears the burden of demonstrating the need for disclosure. *United States v. Harrington*, 951 F.2d 876, 877 (8th Cir. 1991). "[I]n order to override the government's privilege of nondisclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to the determination of the case." *Id.* Put differently, "[t]here must be some showing that the disclosure is vital to a fair trial." *United States v. Curtis*, 965 F.2d 610, 614 (8th Cir. 1992). When deciding whether the confidential informant's identity must be disclosed, courts must balance the defendant's needs against the public's strong interest in preserving the confidences of individuals who report crimes. *Roviaro v. United States*, 353 U.S. 53, 59–62 (1956). Courts consider factors such as the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001) (citing *Roviaro*, 353 U.S. at 60–61); *see also United States v. Lapsley*, 263 F.3d 839, 841 (8th Cir. 2001) ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."). "Where the witness is an active participant or witness to the offense

30

charged, disclosure will almost always be material to the accused's defense." *Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995); *accord United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987) ("The disclosure of an informant who was an active participant in the crime the accused is charged with is generally required."). By contrast, in cases involving "a 'tipster,' i.e., a person who merely conveys information but does not witness or participate in the offense," disclosure is not vital to a fair trial and so is usually not required. *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987).

Here, the CRI provided information about Mr. Turner's drug trafficking activities and participated in two controlled buys. Mr. Turner was not charged with those transactions and therefore the CRI was not an active participant *in the crime charged*. The information from and participation by the CRI formed part of the basis for the subsequent search warrants, but the charges against Mr. Turner relate to the fentanyl and firearm seized during the search of Apartment #6xx, not to the fentanyl sold, through the unwitting person, to the CRI. Therefore, the CRI is not a percipient witness to the crimes charged, nor did the CRI participate in the crimes charged. The CRI merely conveyed information to law enforcement. Mr. Turner has not shown that the disclosure of the CRI's identity would be relevant and helpful to his defense in any other way, or that disclosure is essential to a fair adjudication, such that the privilege should give way. This is also true for the unwitting person, who only participated in the controlled buys.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Turner's First Motion to Suppress (Dkt. No. 38) be **DENIED**;

2. Mr. Turner's Second Motion to Suppress (Dkt. No. 42) be **DENIED**; and

3. Mr. Turner's Motion to Suppress Evidence of Identification (Dkt. No. 52) be

   **DENIED**.

**IT IS FURTHER ORDERED** that:

1. Mr. Turner's Motion to Disclose the Identity of All Informants (Dkt. No. 41)

   is **DENIED**; and

2. Mr. Turner's Motion for Witnesses (Dkt. No. 53) is **DENIED WITHOUT**

   **PREJUDICE**, as premature, with respect to trial witnesses; and **DENIED**

   **AS MOOT** with respect to his request for witnesses at a *Franks* hearing.

Dated: August 19, 2024

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge

## NOTICE

**Filing Objections:** The Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).