**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

               Plaintiff,

v.

Eric Marcel Turner, a/k/a "Xavier Thomas,"

               Defendant.

Case No. 23-cr-252 (KMM/JFD)

**ORDER**

---

This omnibus order addresses several items before the Court in this matter. These items include an August 19, 2024, Report and Recommendation ("R&R") issued by United States Magistrate Judge John F. Docherty and Defendant Mr. Eric Marcel Turner's objections thereto, as well as several additional filings made by Mr. Turner after the issuance of the R&R. Mr. Turner is charged with Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); and being a Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). *See* ECF 1 (Indictment) at 1–2. For the reasons that follow, the R&R is accepted, Mr. Turner's objections are overruled, and Mr. Turner's subsequent motions and requests are denied.

**I.    Background**

The factual basis for the government's prosecution of Mr. Turner is laid out in detail in Judge Docherty's R&R. *See* R&R at 1–12. Mr. Turner filed seven pro se motions, including a First Motion to Suppress (ECF 38), Motion for Disclosure of 404(b)

Evidence (ECF 40), Motion to Disclose the Identity of All Informants (ECF 41), Second

Motion to Suppress (ECF 42), Motion to Suppress Evidence of Identification (ECF 52),

Motion for Witnesses (ECF 53), and Motion for Release of Exculpatory Evidence (ECF

54).  Judge Docherty held two hearings on Mr. Turner's motions—the first on May 30,

2024, and the second on June 21, 2024. *See* ECF 56 (H'rng Tr.); ECF 63 (same). The

Court received exhibits and testimony regarding the use of an unwitting party and

Confidential Reliable Informant (CRI) in two controlled substance buys, the nexus

between an apartment linked to Mr. Turner and suspected drug trafficking activity, a dog

sniff warrant, and surveillance footage described in a detective's affidavit. ECF 63.

Judge Docherty then issued an R&R containing proposed findings of fact and

conclusions of law regarding some of Mr. Turner's motions, as well as orders on other

motions. ECF 67. Judge Docherty denied Mr. Turner's Motion to Disclose the Identity

of All Informants (ECF 41) and his Motion for Witnesses (ECF 53). *Id*. Judge Docherty

recommends that Mr. Turner's First Motion to Suppress (ECF 38), Second Motion to

Suppress (ECF 42), and Motion to Suppress Evidence of Identification (ECF 52) be

denied. *Id*. Mr. Turner filed objections to the R&R on September 5, 2024 (ECF 69) and

amended objections to the R&R on September 13, 2024 ("Amend. Objs.") (ECF 70).

While Judge Docherty's R&R and the objections were pending, this Court held a

status conference, during which Mr. Turner expressed his desire to now be represented

in this matter. *See* ECF 79 (Status Conf. Min. Entry); ECF 81 (Mot. to Appoint

Counsel). The Court granted this request, and counsel was appointed. Counsel

requested time to review matters already filed on the docket and to consider whether

additional filings should be made. This request was likewise granted. ECF 85.

Through counsel, Mr. Turner then made a number of new filings and motions. These include Supplemental Objections to the R&R ("Supp. Objs.") (ECF 89), a new Motion to Suppress certain statements made by Mr. Turner (ECF 87) and a Motion to Dismiss the Indictment against him (ECF 88). This Court held a hearing on January 22, 2025, to address some of the newly raised issues, and Mr. Turner submitted a final post-hearing memorandum in support of the new filings (ECF 120). Mr. Turner's counsel has indicated that all of these filings supplement, rather than supersede, Mr. Turner's previous pro se filings. As such, the Court's analysis will be split into two parts: the first, addressing Judge Docherty's R&R and Mr. Turner's pro se objections; and second, addressing the filings that have been made in this case since the appointment of counsel.

## II.    Discussion

### A.    The R&R and Mr. Turner's Pro Se Objections

A magistrate judge may conduct evidentiary hearings and submit proposed findings of fact and recommended dispositions on motions to suppress evidence. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(1). The district court reviews de novo any portion of the R&R to which specific objections are made. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. LR 72.2(b). When conducting a review of an R&R after the magistrate judge holds an evidentiary hearing, the district court must review the evidence admitted at that hearing, including any transcript of the testimony of witnesses and any video or audio recordings. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008); *Jones v. Pillow*, 47 F.3d 251, 252 (8th Cir. 1995); *United States v. Benitez*, 244 F. App'x 64, 66 (8th Cir. 2007)).

3

As discussed above, Mr. Turner has made multiple filings objecting to Judge Docherty's recommendations. The Court has reviewed the R&R de novo, and thoroughly considered all of Mr. Turner's arguments against its recommendations. The Court finds no legal error in Judge Docherty's analysis and accepts the R&R in full. Here, given the voluminous objections raised by Mr. Turner, the Court organizes its analysis into several central themes in Mr. Turner's filings that preceded the appointment of counsel in this matter.

Most of the issues raised by Mr. Turner in this matter have related to the search warrants that led to his arrest. These warrants include: (1) a warrant to install a tracking device on a White Jeep Cherokee MN Plate HXL449 (the "Vehicle Tracking Warrant"), (2) a warrant to search the rent roll roster of the 590 Park Apartments (the "Rent Roll Warrant"), (3) a warrant to conduct a dog sniff of the lower seam of Apartment 607 of the 590 Park Apartments (the "Dog Sniff Warrant"), (4) a warrant to search the Apartment 607 interior (the "Apartment Search Warrant"), and (5) a warrant to conduct testing of Mr. Turner's DNA (the "DNA Warrant") (collectively, the "Warrants"). ECF 47, Gov't Ex. 1–5. The affidavit supporting each search warrant application contains all the information contained within the previous affidavits, plus additional, new information. *See id.*

In his pro se filings, Mr. Turner focused heavily on the issuance of the Warrants, moving to suppress on the basis that they were not supported by probable cause and challenging Judge Docherty's conclusions to the contrary. Mr. Turner also argued that there is evidence of numerous falsehoods within the affidavits supporting the applications for several search warrants, entitling him to a *Franks* hearing and suppression. Judge Docherty disagreed, declining to hold a *Franks* hearing. As will be discussed in detail below, subsequent developments in this case have largely obviated Judge Docherty's conclusions

4

regarding the need for a *Franks* hearing, as well as Mr. Turner's relevant objections. The Court's analysis here will therefore be limited to its reasons for accepting Judge Docherty's recommendations regarding the probable cause underpinning the search warrants in this case.

### 1.    Probable Cause for Issuance

"Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016); *see also* Fed. R. Crim. P. 41(d). After a judicial officer has issued a warrant upon a finding of probable cause, that finding should be paid "great deference" by reviewing courts. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Therefore, when reviewing the issuance of a warrant, a court "ensur[es] only that the judge 'had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (quoting *Illinois*, 462 U.S. at 236). When the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).

Taken together, the legal standard governing this Court's de novo review of each warrant is whether the issuing judge had a "substantial basis" for concluding that there was a "fair probability" that the warrant would uncover evidence of wrongdoing. This Court has conducted a thorough de novo review of the record, the R&R, Mr. Turner's objections, the government's replies to Mr. Turner's objections, and the relevant legal standards. This Court finds Judge Docherty's probable cause analysis includes an accurate representation of law and appropriate application of that law to the facts of Mr. Turner's case. The Court agrees

with Judge Docherty that each search warrant was supported by probable cause and incorporates by reference the probable cause analysis found in the R&R. Below, this Court specifically addresses several of the probable cause objections raised by Mr. Turner.

**The "Similar Pattern Doctrine":** As discussed above, five warrants were issued in total in this case. In the first two search warrant applications—the Vehicle Tracking Warrant Application and Rent Roll Warrant Application—Hennepin County Sheriff's Detective Jeremiah Jessen describes law enforcement's use of a CRI and unwitting party in several controlled buys of fentanyl from Mr. Turner. ECF 47, Gov't's Ex. 1–2.

Mr. Turner essentially objects to the use of a CRI and unwitting party in the controlled buys, and to the reliance on those facts in securing the warrants. ECF 70 at 4–5. Mr. Turner, in what he describes as the "similar pattern doctrine," argues that law enforcement officers investigating drug crimes commonly receive a tip from a CRI, provide a CRI with buy money, and visually surveil either the CRI or an unwitting party during a controlled buy. *Id.* Mr. Turner suggests that these practices do not establish probable cause because (1) law enforcement did not monitor—through cameras or microphones—the interaction between the CRI and the unwitting party, or the controlled buy itself; (2) neither the CRI nor officers personally witnessed the transaction; (3) the CRI did not carry out the controlled buy; (4) and the unwitting party's person was not searched for drugs prior to the buy. ECF 70 at 2, 13. Mr. Turner also emphasizes that, in this case, the Jeep in which the controlled buy took place had heavily tinted windows, so surveilling officers could not physically observe the transaction from outside the vehicle. *Id.* at 10, 13, 14.

Mr. Turner is correct that the use of a CRI during drug investigations is common. Moreover, the Court does not disagree that officers could have taken additional steps to yield

an even higher degree of confidence that Mr. Turner was committing a crime during the controlled buys. But the law does not require that law enforcement officers employ every conceivable measure to establish probable cause: warrant applications need only establish a fair probability that the warrant will uncover evidence of a crime. *Faulkner*, 826 F.3d at 1144. Nor does Mr. Turner cite to any authority suggesting that the common use of CRIs renders the information gained from them unreliable or unsupportive of probable cause. Instead, the Eighth Circuit has held that "[w]hen an informant has provided reliable information in the past . . . a court may deem the informant's tip sufficiently reliable to support a probable cause determination." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006). The reliability of an informant is established "if the person has a history of providing law enforcement officials with truthful information." *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998).

With these standards in mind, the Court agrees with the R&R that the CRI used here was reliable because it is undisputed that the informant had provided information to Detective Jessen in the past that resulted in the controlled purchase of narcotics and search warrants leading to the seizure of narcotics. *See* ECF 47, Gov't's Ex. 1. And the successful completion of the first controlled buy made reliance on the CRI for the second one even more reasonable. Given the CRI's history, the information gained from their participation in the buys provided a substantial basis for the issuing judge's probable cause determination. Thus, this Court finds Mr. Turner's "similar pattern doctrine" unavailing and affirms Judge Docherty's conclusion that the use of the CRI to establish probable cause was acceptable.

*"Mere Association" Argument*: In the Dog Sniff and Apartment Search Warrant Applications, affiant Detective Jessen attests that electronic surveillance established frequent

7

visits by the Jeep registered to Mr. Turner—MN Plate HXL449—to the 590 Park Apartments. ECF 47, Gov't's Ex. 2–3. In the Dog Sniff Application, Detective Jessen states that electronic surveillance established that, as of April 12, 2023, the vehicle visited 590 Park approximately 37 times in the 16 days prior to the application; these stops ranged between 6-20 minutes in length, occurring as early as 7:00am and as late as 1:30 am. ECF 47-2 at 6. Similarly, he states in the Apartment Search Warrant Application that the Jeep had visited the apartment building 40 times in the 21 days before April 12, 2023, with similarly short stops. ECF 47-3 at 6.

Mr. Turner insists that he was not "'[p]hysically' seen nor observed at the 5xx street location 37 to 40 times," and that even if he was, his "mere association" with Apartment #607 does not give rise to probable cause for the Dog Sniff and Apartment Search Warrants. ECF 70 at 2, 19. Mr. Turner relies on two cases to support his argument: *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person") and *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983) ("[I]t is settled that mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest . . . [n]or is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes."). But *Ybarra* and *Everroad* do not help Mr. Turner's position.

In *Ybarra*, law enforcement searched the defendant's person on the *sole* basis that he was sitting inside of a bar that law enforcement had acquired a warrant to search. *Ybarra*, 444 U.S. at 88. In *Everroad*, law enforcement arrested the defendant because he accompanied a third person, who law enforcement "knew to be involved in a drug transaction . . . to areas

8

where the deal was being arranged," and was staying at a motel near the location of the drug transaction. *Everroad*, 704 F.2d at 406. Here, the warrants are different, relating to a search of an apartment, and not a person. Probable cause for the Dog Sniff and Apartment Search Warrants rests on whether the issuing judge had a substantial basis for believing there was a fair probability that searching the *apartment* would uncover evidence of a crime. In other words, connecting the apartment to a crime is what mattered, not connecting the apartment to Mr. Turner.

Furthermore, Mr. Turner's "mere association" argument suggests that it was the fact of the Jeep's visits to the apartment building, alone, formed the basis for the warrants to search Apartment 607. This is not the case. Detective Jessen also attested that the vehicle was the focus of two controlled buys, was registered to Mr. Turner, was seen entering the secured parking garage attached to the 590 Park building, that Mr. Turner used a garage opener associated with Apartment 607 to open the parking garage door and enter the parking garage, and that Mr. Turner was seen interacting with a person who rode the elevator from the sixth floor down to the parking garage to meet with him at his car, and that this person was initially identified by apartment management as "Xavier Thomas," the renter of Apartment 607. *See, e.g.*, ECF 47-3 at 5–6. Moreover, the frequency and—often—the brevity of trips to the apartment was itself noteworthy. Like Judge Docherty, this Court concludes these attestations, taken together, were more than sufficient for the issuing judge to find probable cause to issue both the Dog Sniff and Apartment Search Warrants.

### B.    Post-R&R Developments

Through counsel, Mr. Turner has now filed a number of new motions and raised new arguments, many of which were never before Judge Docherty and therefore were not

contemplated or addressed in his R&R. For the sake of efficiency, the Court considers these new motions and arguments in the first instance, without referral to the magistrate judge for an additional recommendation. Mr. Turner also appeals a ruling regarding the disclosure of witness identity that was included in Judge Docherty's R&R, which the Court addresses below.

### 1.    Nighttime Execution of Tracking Warrant

In his supplemental objections, Mr. Turner challenges the execution of one of the Warrants, the Vehicle Tracking Warrant. Mr. Turner now asserts that it was executed during the night, contrary to its authorization, and that any evidence obtained from it must be suppressed.[1] Supp. Objs. at 2–4. The Court held a hearing on January 22, 2025, in part to address the nighttime execution issue.

It is undisputed that the Vehicle Tracking Warrant issued from a Minnesota state court judge. It is further undisputed that nighttime execution of the Vehicle Tracking Warrant was not requested, and that the warrant issued without specifying any time of execution. *See* ECF 47 at 5–6 (Vehicle Tracking Warrant). Indeed, the warrant contains no mention of timing whatsoever. Ultimately, the Vehicle Tracking Warrant was executed shortly before 5 a.m. on March 28, 2023. *See id.* at 7. Mr. Turner argues that execution of the Vehicle Tracking Warrant did not comply with Minn. Stat. § 626.14, subd. 1 or Rule 41 of the Federal Rules

---

[1] The nighttime execution issue was not previously raised by Mr. Turner and therefore was not addressed by Judge Docherty in his R&R. The government has provided its opposition to the nighttime execution argument on the docket. *See* ECF 94 (Gov't Opp. to Def's Mot. to Supp.) at 5–8. Based on the parties' submissions, this Court will determine the nighttime execution issue in the first instance, without submission to the magistrate judge for an additional report and recommendation.

of Criminal Procedure, and therefore this Court may suppress the evidence obtained from it. Supp. Objs. at 3. This is because both the statute and the federal rule require that a search warrant issued by a federal judge provide for a time of execution; absent good cause, the time is assumed to be during the day. Mr. Turner therefore argues that all evidence obtained by the nighttime execution of the Vehicle Tracking Warrant must be suppressed. *Id*. at 4.

The Court disagrees. It is true that Minn. Stat. § 626.14, subd. 1, provides that a warrant "may be served only between the hours of 7:00 a.m. and 8:00 p.m. unless a nighttime search outside those hours is authorized." But as Mr. Turner concedes, this Court does not suppress evidence on the basis that it was seized in violation of state law. Supp. Obj. at 3 (citing *United States v. Applequist*, 145 F.3d 976, 978 (8th Cir. 1998)). And in any event, it is not even clear that Detective Jessen's execution of the Vehicle Tracking Warrant at night did, in fact, violate the Minnesota statutes. Minn. Stat. § 626A.37 broadly governs the issuance and contents of orders authorizing various tracking and surveillance efforts by police, and this section of state law makes no distinction between daytime and nighttime in execution.

Mr. Turner primarily relies on a supposed violation of federal rules as requiring suppression.[2] But as a threshold matter, the Eighth Circuit has expressly held that "Rule 41 applies exclusively to federal searches." *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006) (citing *United States v. Schroeder*, 129 F.3d 439, 443 (8th Cir. 1997)). The Court's analysis could end there because there is no suggestion that federal authorities were involved

---

[2] Rule 41(e)(2)(C)(i)-(iii) governs the issuance and contents of federal warrants to install tracking devices. Unlike the analogous Minnesota statute section, the rule *does* require specificity about whether a device will be installed during the day or night.

in the execution of the Vehicle Tracking Warrant. But even if Rule 41 applied, this Court would not order suppression of evidence obtained from it due to the fact that it was executed at night.

Exclusion for a violation of Rule 41 is required "only if a defendant is prejudiced or if reckless disregard of proper procedure is evident." *Id.* (citing *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994)). Mr. Turner does not argue that he was prejudiced by the warrant's execution a little over an hour[3] before the daytime hours specified in the Federal Rules. Instead, he maintains that there is evidence that the investigating detective acted with disregard for the daytime/nighttime execution distinction that is recognized by Rule 41. This argument rests on the contention that Detective Jessen subsequently applied for the Dog Sniff Warrant, and explicitly requested for nighttime execution. Supp. Obj. at 3–4. In other words, Mr. Turner alleges that Detective Jessen was aware of the sensitivities of execution-timing that apply when seeking and carrying out warrant-backed searches, but chose to ignore them when executing the Vehicle Tracking Warrant.

This argument is belied by the record. There is nothing before this Court that would indicate that the omission of daytime/nighttime specificity in the warrant was the result of a "reckless disregard" for federal procedure by Detective Jessen, and as discussed above, it is not at all clear that a tracking order sought and issued under Minnesota law required the daytime/nighttime distinction of Rule 41. There is no evidence, and Mr. Turner does not

---

[3] Under the federal rule, "daytime" extends from 6 a.m. to 10 p.m. *See* Fed. R. Crim. Pro. 41(a)(2)(B). This is an hour earlier than provided under Minnesota law. *See* Minn. Stat. 626.14, subd. 1.

appear to seriously contend, that Detective Jessen deliberately attempted to obtain a warrant that lacked information about timing, in contravention of the federal rules. Nor is there any evidence that Detective Jessen, having obtained a tracking warrant that did not mention a time of execution, recklessly disregarded a federal procedure that nonetheless required him to only place the GPS tracker in the daytime.

Most critically, Detective Jessen's testimony undermines any suggestion of "reckless disregard." Detective Jessen testified that the computer-based form he used to request authorization to place the GPS tracker on Mr. Turner's vehicle does not include any option to request a particular time of execution. He further testified that he has sought and executed many similar tracking orders in the state of Minnesota and that none has ever specified a time of execution. In short, Detective Jessen credibly testified that, to the best of his knowledge, a warrant for attaching a GPS tracker on a vehicle in Minnesota had no daytime/nighttime requirement at all.

In short, there is no evidence before the Court that Detective Jessen was aware of any daytime/nighttime execution requirement of the Federal Rules of Criminal Procedure, let alone that he was recklessly disregarding such a requirement when he attached the GPS tracker to Mr. Turner's vehicle at night. At the time that Detective Jessen attached the tracker, he was engaging in a routine state-led investigation of a suspected drug dealer in Minnesota. He had no belief that his actions were governed by any federal procedural rule, and there is no evidence or persuasive argument before the Court that he should have. As such, even assuming that Rule 41 applied to the execution of the Vehicle Tracking Warrant and even assuming that the rule was violated by Detective Jessen's nighttime execution, the Court will not suppress the evidence obtained from it because it finds no "reckless disregard" for the

rule.

### 2. *Franks* hearing

An affidavit supporting a search warrant is presumed to be truthful. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct," but rather, "that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165. A defendant may seek a *Franks* hearing "to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions *relevant to the probable cause determination*." *See United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (emphasis added). Before a court will convene a *Franks* hearing, the defendant must make a substantial preliminary showing that (1) the affidavit contained a false statement made either knowingly and intentionally, or with reckless disregard for the truth; *and* (2) with the false statement corrected or the missing information inserted, the affidavit no longer establishes probable cause for the search. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). Recklessness may be inferred from omissions in an affidavit when the material omitted "would have been clearly critical to a finding of probable cause." *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015) (quoting *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011)). In short, a defendant must make a substantial preliminary showing that demonstrates not only that the false statements were made knowingly, intentionally, or with reckless disregard for the truth, but also that, without the statements, the search warrant was not supported by probable cause. *Franks*, 438 U.S. at 171–72.

Here, Mr. Turner has persistently sought a *Franks* hearing to investigate the

14

truthfulness of affidavits supporting the search warrants discussed throughout this Order. In his original filings, Mr. Turner called into question the veracity of the affidavits on many grounds. *See generally* ECF 70. In the R&R, Judge Docherty largely rejected Mr. Turner's position on alleged falsehoods. However, he acknowledged a contradiction between the sworn affidavits of two different affiants related to two of the warrants, but nevertheless declined to hold a *Franks* hearing on that matter. In brief, the contradiction involved whether an apartment manager had made an identification of the driver of the vehicle registered to Mr. Turner entering the complex's parking garage, or whether they had made that identification about a man who was seen in one of the building's elevators. He concluded, in part, that neither search warrant application lacked probable cause, even when excising the contradictory and allegedly false statements identified by Mr. Turner. *See* R&R at 21–27. Mr. Turner has objected to this recommendation and argued that his *Franks* arguments were more expansive than the R&R addressed, but this Court has thoroughly reviewed Judge Docherty's *Franks* analysis and the underlying affidavits and finds no error in his approach or conclusions.

However, since the issuance of the R&R, the factual landscape changed somewhat. Specifically, Mr. Turner submitted a police report prepared by Detective Antonio Patsy, in which he describes an April 6, 2023 interaction with the management of an apartment complex where Mr. Turner is alleged to have kept drugs. *See* ECF 90 at 5. Detective Patsy's interactions with apartment management are also described in affidavits prepared by Detective Jesson for search warrant applications on April 12, 2023 and April 17, 2023. *See* ECF 47-2, ECF 47-3. Mr. Turner notes that Detective Patsy's report does not include all details found in Detective Jessen's subsequent affidavits and asserts there are timing

discrepancies between the described interactions. *See* ECF 89 at 7–9. Because these matters generally involve the same facts that underlie the contradiction between two warrants noted by Judge Docherty, Mr. Turner argues that this discrepancy is further evidence that officers were lying in their warrant applications. *Id*. As this Court was already due to hear testimony from Detective Jessen concerning the placement of the tracking device, discussed above, the Court determined that it would allow Mr. Turner to inquire into the basis for Detective Jessen's knowledge of Detective Patsy's interactions with apartment management. *See* ECF 97 (Order Setting Hearing). The Court noted that this was a provisional determination that did not amount to a finding that Mr. Turner had made the substantial preliminary showing necessary for a *Franks* hearing, but that it was most efficient to allow the testimony given the upcoming trial date. *Id*. at 3–4.

As a practical matter, however, the Court's decision to allow the questioning under oath of Detective Jessen about his affidavits granted Mr. Turner the *Franks* hearing he has sought all along. This hearing was held on January 22, 2025. ECF 105. Detective Jessen ultimately testified about the basis for his statements in warrant applications he drafted, as well as his understanding about the apparent discrepancy between the 2023 and 2024 warrants. Broadly speaking, this testimony was highly credible and undermines any conclusion that any of the affidavits in this case have contained falsehoods. The Court explains its reasoning below.

***Dog Sniff Warrant***: In the Dog Sniff Warrant application, Detective Jessen attests that Detective Patsy spoke with 590 Park management and reviewed surveillance video of the inside of the building and the secure parking garage. ECF 47-2, Gov't Ex. 3. at 5. Detective Patsy is said to have observed the "Jeep driven by Turner" enter the apartment parking garage,

an "unknown black male" enter the elevator on the 6th floor, take the elevator to the parking garage, approach the driver's side door, "meet [with Turner] for a short amount of time," and walk back into the apartment building. *Id.* Detective Jessen stated in his affidavit that during the video identification, apartment management identified the unknown black male as "Xavier Thomas" and told Detective Patsy that Mr. Thomas rents Apartment 607. *Id.*

Mr. Turner has persistently attacked this portion of the search warrant affidavit on various grounds, most recently on the grounds that Detective Patsy did not describe watching surveillance footage with apartment management in a subsequent police report he prepared. However, Detective Jessen provided credible and comprehensive testimony about his knowledge of Detective Patsy's interactions with apartment management and his basis for describing those interactions in his affidavit. He explained his understanding that Detective Patsy's police report actually memorialized a different, earlier interaction with apartment management. He testified that, to his knowledge, Detective Patsy had met with apartment management on more than one occasion. He explained that Detective Patsy had informed him about a meeting with apartment management in which he reviewed surveillance footage and

observed the unknown black male, identified by management as being "Xavier Thomas."[4] His testimony describing his discussions with Detective Patsy was consistent with the information contained in his affidavit. And while Detective Jessen candidly acknowledged the lack of a separate police report detailing Detective Patsy's subsequent visit with apartment management, this did not detract from the credibility of his testimony. Indeed, Detective Jessen credibly testified that he and Detective Patsy have worked closely together for years and about his high degree of trust in Detective Patsy's work.

As such, the Court concludes that there is no basis from which to conclude that Detective Jessen was lying, or recklessly disregarding any truth, with respect to his characterization of Detective Patsy's interactions with apartment management in applying for the Dog Sniff Warrant, or any other warrant at issue.

***Apartment Search Warrant***: Mr. Turner has also questioned the veracity of Detective Jessen's affidavit supporting the subsequent Apartment Search Warrant application, in which he describes the results of the dog sniff. In particular, Mr. Turner complains about a purported lack of documentation of this sniff and about Detective Jessen's characterization of the

---

[4] Mr. Turner has also pointed to the fact that, at one point in the investigation, investigators appeared to have erroneously believed that Mr. Turner and Xavier Thomas were different people. The salience of that apparent confusion to any lack of probable cause in the warrants issued in this case has never been satisfactorily explained by Mr. Turner. But in any event, Detective Jessen's testimony resolved any lingering concerns that the confusion was the product of any sort of malfeasance or a pattern of lying by police. Instead, Detective Jessen's testimony heavily supported the conclusion that he and his partners had faced a number of unknowns while investigating Mr. Turner, including the extent to which other suspects may have been involved, that eventually resolved in their realization that Mr. Turner and Xavier Thomas were one and the same person. Contrary to Mr. Turner's repeated suggestion, such a factual pattern is not indicative of anything other than the ordinary progress of an investigation.

qualifications of the canine used. In light of Detective Jessen's testimony, the Court concludes that there is no evidence of falsehood in the portions of the affidavit concerning the dog sniff.

First, nothing in Detective Jessen's credible testimony casts any doubt on whether the dog sniff took place. Detective Jessen testified credibly about his working relationship with the K9 officer who conducted the dog sniff in question. He explained that he was at the scene during the sniff. He described the information that the K9 officer provided to him about the outcome of the sniff, including that the dog alerted to the presence of fentanyl. This testimony supports the truthfulness of his description of the sniff, made in his affidavit in support of the Apartment Search Warrant.

Second, nothing in Detective Jessen's testimony casts doubt about his characterization of the qualifications of the canine that was used. The affidavit stated that "[Detective Jessen] knows K-9 Kya is certified . . . in the detection of narcotics." ECF 47-3 at 6. As it turns out, the canine was not specifically certified at that time in the detection of fentanyl, but Detective Jessen testified that he had not been aware, at the time of preparing the affidavit, of this fact. But nothing about this testimony calls into question the veracity of the statement that the dog was certified in narcotics and nothing about the testimony suggests that Detective Jessen was not being truthful by saying as much in his affidavit. In short, the Court discerns no misstatement at all in this aspect of the affidavit.

**DNA Warrant**: Mr. Turner also maintains arguments around a discrepancy between Detective Jessen's account of Detective Patsy's interactions with apartment management, discussed above, and an account of the same interactions by Detective Ryan Westby in his DNA Warrant Application affidavit. The DNA Warrant affidavit was prepared about a year

after the Dog Sniff Warrant affidavit. In the later affidavit, Detective Westby stated that the apartment complex building manager identified the "black male driving the Jeep Cherokee" as Xavier Thomas, rather than identifying the "unknown black male" from the elevator as Xavier Thomas. ECF 47-4, Gov't Ex. 5 at 5. Mr. Turner argues that this discrepancy between the identifications described in the two affidavits reveals the detectives have been lying in their affidavits throughout. Once more, this conjecture is undermined by Detective Jessen's credible testimony. As discussed above, Detective Jessen credibly testified about his conversations with Detective Patsy and about his understanding of what Detective Patsy observed and was told in his multiple meetings with apartment management. This testimony supports the truthfulness of Detective Jessen's own affidavit.

To the extent that Mr. Turner is challenging the DNA Warrant as well, that challenge is unavailing. While Detective Westby may have had some confusion about admittedly confusing details, this does not undermine the validity of the warrant. Even if Paragraph 19 is entirely removed from the application, there remains voluminous information connecting Mr. Turner to fentanyl that is more than sufficient to support probable cause for the DNA Warrant. *Gonzalez*, 781 F.3d at 430.

***Garage Door Opener Claims:*** In the Dog Sniff Warrant Application, Detective Jessen also stated that "management told Det. Patsy that each apartment is assigned a specific garage door opener for the secure parking garage" and that "management told Det. Patsy the garage door opener being used by Turner to enter the garage belongs to [Xavier] Thomas at Apt. #607." ECF 47-2 at 5. Mr. Turner has argued that Detective Jessen was lying about apartment management connecting the garage opener to Mr. Turner and Apartment 607, stating that a garage opener cannot be linked to any specific apartment. ECF 70 at 25, 41–43. In doing so,

20

Mr. Turner relies upon an interview between his investigator, Todd Turpitt, and the apartment manager. *See* ECF 70 at 25 (arguing that Mr. Turpitt's interview establishes the fact that law enforcement lied in their affidavits); *see also* ECF 66-1 (Turpitt Rep.) at 1–2.

Mr. Turpitt explains that in March 2024, he interviewed Ash Anderson, who was the property manager of 590 Park Apartments in April 2023. Turpitt Rep. at 1–2. Mr. Turpitt states that Ms. Anderson told him that in April 2023 "she did not know how to properly use the [garage opener] system" and that "any fob/opener may have not been labeled with the proper name in that system." *Id.* Ms. Anderson also told Mr. Turpitt that logs existed showing whether a specific garage or entry door was opened by a specific opener at any given time, but she was unsure whether those logs still existed, or whether they had been provided to law enforcement at the time of investigation. *Id.*

Simply put, Ms. Anderson's statements about her understanding and knowledge of the garage-door-opener system do not undermine what she told to officers in April 2023 about those openers, and are not enough for the requisite substantial preliminary showing for a further *Franks* hearing regarding Detective Jessen's statements about the door opener. Had Ms. Anderson told Mr. Turpitt that she never told Detective Patsy that the opener was associated with Apartment 607, for instance, or had she told Mr. Turpitt that she had *told* Detective Patsy she lacked knowledge or competence about the opener system, then that might call into question the unequivocal statements attributed to her in the warrant applications. But that is not what Mr. Turpitt's report says. Ms. Anderson's later questioning of her own earlier understanding does not suggest that she did not tell Detective Patsy what was described in Detective Jessen's affidavit. And it does not undermine the assumption of truthfulness that attaches to a warrant affidavit.

But even if Mr. Turpitt's report was enough to have secured Mr. Turner a *Franks* hearing, the testimony that Detective Jessen provided on other topics at the January 22 hearing conclusively quashed any suggestion that he was being untruthful about what he reasonably believed apartment management had told Detective Patsy about the openers. Indeed, in providing testimony about his knowledge of Detective Patsy's interactions with apartment management generally, Detective Jessen also credibly testified about the basis for his belief that Detective Patsy had spoken with apartment management about the openers specifically. He testified that Detective Patsy had informed him that management explained the operation of the openers, including that tenants were assigned openers that were associated with individual apartments. That testimony was consistent with the information he put into his affidavits concerning Detective Patsy's interactions with management. And as described, the Court found Detective Jessen's testimony to be quite credible.

### 3. Motion to Dismiss

Mr. Turner has also filed a motion seeking to dismiss the Indictment, in which he argues that the prohibition in 18 U.S.C. § 922(g)(1) on possession of firearms by felons is unconstitutional on its face and as applied to his case. ECF 88. Mr. Turner filed this motion after Judge Docherty's R&R, and the Court will consider it here in the first instance.

Mr. Turner argues that 18 U.S.C. § 922(g)(1) is facially unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) because its restrictions are inconsistent with the historical tradition of firearm regulation in this country. *Id*. at 2–3. He also argues that it is unconstitutional as applied to Mr. Turner because "Mr. Turner's prior offenses fail to evince violence or dangerousness." *See id*. at 3–4 (citing *Bruen* and *United States v. Rahimi*, 144 S. Ct. 1889 (2024)). Mr. Turner acknowledges that his argument was

foreclosed by *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), a holding that was vacated last year by the Supreme Court for further consideration in light of *Rahimi*. *Id*. at 1. However, the Eighth Circuit thereafter reaffirmed the *Jackson* holding. *See United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024). Mr. Turner nevertheless moves for dismissal in an effort "to preserve this issue in preparation of possible future developments in the law." ECF 88 at 1. For now, it is clear that the relief Mr. Turner seeks remains foreclosed by the Eighth Circuit's *Jackson* decisions. Accordingly, the Court denies the motion to dismiss. However, Mr. Turner's arguments regarding 18 U.S.C. § 922(g)(1) are preserved should the Supreme Court provide further relevant guidance.

### 4. Motion to Suppress

Next, the Court addresses Mr. Turner's new motion seeking suppression of "any confessions, or statements in the nature of confessions, and any evidence derived from or discovered as a result of any confessions obtained from Mr. Turner." ECF 87 at 1. Like his motion to dismiss, this motion was not submitted to Judge Docherty and is addressed in the first instance by this Order.

At issue are statements made by Mr. Turner to police after his arrest during an automobile stop, which occurred on April 19, 2023, following the execution of the search warrants discussed above. *See id*. Mr. Turner contends that these statements were made in custody and without the benefit of a warning pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and therefore they should be suppressed. *Id*. The government does not appear to dispute that Mr. Turner was not read his *Miranda* rights but argues that Mr. Turner's statements to police were largely voluntary and unprompted by any police questioning and therefore their use as evidence does not violate *Miranda*. *See generally* ECF 94 (Govt.'s Obj.

to Mot. to Suppr.). Furthermore, the government has agreed to "self-suppress" certain of Mr. Turner's statements made during his arrest. *See id*. at 4, 5.

The statement that remains in dispute is an exclamation made by Mr. Turner during the search of his car, following an initial set of queries by police as to whether he had any drugs or weapons on him and a question about what his key fob was for.[5] According to the government, while standing beside officers a few moments later, Mr. Turner abruptly states, "I'm going back to prison for a long time, oh my God."[6] Gov't Exh. 3 (BWC #3) at 5:38–5:58.[7] This was followed by a brief conversation with an officer, who first inquired, "how much time is over your head?" and resulted in Mr. Turner explaining his belief that he was facing heavy punishment due to a prior conviction in North Dakota. *Id*. at 5:59–7:00. The government has agreed not to use statements made in this back-and-forth initiated by the officer's question about how much time Mr. Turner was facing. ECF 94 at 4. However, the government states that it intends to introduce the initial statement regarding "going back to prison for a long time." *Id*. To the extent Mr. Turner argues that the statement that he was

---

[5] The government contends, and Mr. Turner does not appear to dispute, that answers to the questions regarding the presence of drugs and weapons would be admissible even without a *Miranda* warning. ECF 94 at 2 (arguing that the "public safety exception" shields from suppression answers to pre-Miranda questions "asked in furtherance of public safety and not designed to solicit testimonial evidence.") (quoting *United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008)). However, a statement made by Mr. Turner in response to the question about the key fob is one of those that the government agrees it will not seek to admit.

[6] The Court finds this portion of the transcript somewhat difficult to hear. That issue does not impact the *Miranda* issue, however.

[7] References to the BWC footage are made to exhibits submitted to the Court by the government in support of its opposition to Mr. Turner's motion to suppress. The Court has independently reviewed that footage.

"going back to prison for a long time" is inadmissible, the Court disagrees.

"'A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings.'" *United States v. Thompson*, 976 F.3d 815, 824 (8th Cir. 2020) (quoting *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995) (internal quotations omitted). Having carefully reviewed the body-worn camera in this matter, the Court concludes that the statement by Mr. Turner to the effect that he was going back to prison for a long time was plainly voluntary and not made in response to interrogation. No officer inquired at all about any potential sentence Mr. Turner was facing for the crime of his arrest, nor did any officer make any other inquiry that would invite such a statement from him. The only police questions that preceded the statement were routine questions incident to arrest, and in any event, there was a gap in time between those questions and Mr. Turner's statement. In short, the statement by Mr. Turner at the heart of his motion appears to have been made spontaneously and voluntarily. Such a statement is not inadmissible even if it is made without the benefit of a *Miranda* warning, and the Court therefore will not suppress it.

### 5. Disclosure of Witness Identities

Judge Docherty denied a Motion to Disclose the Identity of All Informants (ECF 41), filed by Mr. Turner. *See* R&R at 30–31. Mr. Turner disagrees with that ruling. Mr. Turner's initial motion seeking disclosure of the witness identities was denied by Judge Docherty. *See* R&R at 29–32. Mr. Turner likewise challenges this order in his R&R objections, which the Court construes as a request for reconsideration pursuant to 28 U.S.C. § 636(b)(1)(A). Under that statute, this Court will review Judge Docherty's order denying Mr. Turner's motion for clear legal error.

At issue in Mr. Turner's motion is the identity of the CRI, discussed above, who provided the government with information about Mr. Turner's alleged drug trafficking activities and participated in two controlled buys, as well as the identity of the unwitting participant in those buys. As Judge Docherty correctly explained, under the prevailing law, the government has a limited privilege to withhold the identities of confidential police informants, and defendants bear the burden of overriding that privilege by showing that disclosure of a confidential informant's identity is vital to their defense. R&R at 30 (citing *McCray v. Illinois*, 386 U.S. 300, 311 (1967). With that in mind, Judge Docherty concluded that Mr. Turner had failed to meet his burden because the CRI at issue was not an active participant in the crime with which Mr. Turner is charged, but rather merely a participant in activities that led to the issuance of the search warrants discussed above. *See id*. at 31. As such, Judge Docherty determined that Mr. Turner "had not shown that the disclosure of the CRI's identity would be relevant and helpful to his defense in any other way, or that disclosure is essential to a fair adjudication, such that the privilege should give way." *Id*. at 31. The same was true as to the disclosure of the identity of the unwitting participant. *Id*.

The Court finds no error, clear or otherwise, in Judge Docherty's reasoning. However, the government has recently filed a notice pursuant to Federal Rule of Evidence 404 of its intent to offer evidence about the controlled buys. *See* ECF 101. This evidence would include information about the roles of both the CRI and unwitting accomplice in allegedly purchasing drugs from Mr. Turner. The government contends that such evidence is probative of Mr. Turner's intent to possess and distribute fentanyl, as well as to "show knowledge, absence of mistake, and lack of accident, and . . . to rebut any claim of third-party liability." *Id*. at 4. Given that this notice might change the calculus somewhat as to whether or not the identities

of the CRI and the unwitting informant are discoverable, the Court intends to hear argument during the pre-trial conference in this matter, at which point the Court will determine whether it is necessary to revisit any portion of Judge Docherty's disclosure order.

## III.    Order

Based on the discussion above, **IT IS HEREBY ORDERED that:**

1. Consistent with the above, the R&R (ECF 67) is accepted, and Mr. Turner's Objections are overruled.

2. Mr. Turner's First Motion to Suppress (ECF 38) is **DENIED**;

3. Mr. Turner's Second Motion to Suppress (ECF 42) is **DENIED**;

4. Mr. Turner's Motion to Suppress Evidence of Identification (ECF 52) is **DENIED**;

5. Mr. Turner's Motion to Suppress (ECF 87) is **DENIED**; and

6. Mr. Turner's Motion to Dismiss (ECF 88) is **DENIED**.


Date: February 10, 2025                  *s/Katherine Menendez*
                                         Katherine  Menendez
                                         United States District Judge